**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE JOINT MEETING OF ESSEX AND UNION COUNTIES, | Civil Action No. 02-5116 (KSH) |
| Plaintiff, | **OPINION** |
| v. | |
| PARSONS ENGINEERING-SCIENCE, INC., | |
| Defendant, | |
| ATLAS-STORD, INC. | |
| Plaintiff, | |
| v. | |
| PARSONS ENGINEERING-SCIENCE, INC., | |
| Defendant, | |
| PARSONS ENGINEERING-SCIENCE, INC., | |
| Third-Party Plaintiff, | |
| v. | |
| HATCH MOTT MACDONALD (formerly known as Killam Associates); M&R MECHANICAL CONTRACTORS, INC., and DYNAMIC AIR, INC., | |
| Third-Party Defendants. | |

**KATHARINE S. HAYDEN, U.S.D.J.**

In this consolidated matter, The Joint Meeting of Essex and Union Counties ("Joint Meeting") and Atlas-Stord, Inc. ("Stord") each filed a separate action against Parsons Engineering-Science, Inc. ("Parsons"), asserting state law claims related to Parsons' design and construction of a sewage drying equipment and facility.  The Court has diversity jurisdiction pursuant to 28 U.S.C. §1332.

Parsons answered and filed a third-party complaints in each lawsuit seeking indemnification or, in the alternative, contribution from entities that were involved in the construction of the sewage drying equipment and facility, third-party defendants Hatch Mott MacDonald ("HMM"), formerly known as Killam, M&R Mechanical, Inc. ("M&R), and Dynamic Air, Inc. ("Dynamic").  HMM, M&R, and Dynamic now move for summary judgment.

**Background**

Joint Meeting is an authority comprised of thirteen municipalities in Essex and Union Counties, and  maintains sewage disposal facilities in New Jersey for its constituent municipalities.  On December 4, 1989, Joint Meeting entered into a Consent Decree with the federal government and the State of New Jersey that required Joint Meeting to cease all ocean dumping of sewage pursuant to the Ocean Dumping Ban Act, 33 U.S.C. §1414(d), and the New Jersey Ocean Sludge Dumping Elimination Act, N.J.S.A. 58:10A-44.  (Moran Aff., Exh. 9, at 1.) In addition, Joint Meeting was required to develop a long-term alternative for long-term land-based sewage management.  Id. On December 7, 1992, the Consent Decree was modified to provide a schedule for Joint Meeting to implement its long-term alternative.   The modified Consent Decree required on-site generation of a sludge derived product with off-site distribution

for beneficial use.  Id.

Joint Meeting sought professional engineering services from Parsons, which initially developed a land-based sludge management plan that called for the incineration of dewatered sludge.  (Moran Aff., Exh. 6, ¶¶ 4,5.)  On October 17, 1991, at a board meeting that Parsons attended, the parties discussed the beneficial reuse of sewage sludge as an alternative to incineration.  (Moran Aff., Exh. 6, ¶6.)  Parsons undertook a Beneficial Reuse Study to evaluate the possibility of alternative uses for sewage sludge and presented the Study to Joint Meeting in January 1992.  (Moran Aff., Exh. 6, ¶¶ 7 & 10.)  According to Parsons, it met shortly afterwards with Joint Meeting and discussed the advantages and disadvantages of several sludge technologies.  (Moran Aff., Exh. 6, ¶11.)  After pilot testing, Joint Meeting chose an indirect sludge drying system comprised of specialized equipment, along with a facility to process and store sewage sludge.  (Moran Aff., Exh. 1, ¶¶20-24 & Exh. 6, ¶¶20 & 24.)  Indirect drying involves drying dewatered sludge through an indirect dryer and then compacting and granulating the dried sludge using specialized equipment to produce a pellet or granule, which can be used as fertilizer.  (Moran Aff., Exh. 10 at 1-3.)

In July 1992, Joint Meeting and Parsons contracted for Parsons to design both sludge drying equipment to convert the dewatered sewage sludge into reusable pellets, and an on-site facility to store the pellets.  (Moran Aff., Exh. 1, ¶24 & Exh. 6, ¶24.)  Joint Meeting accepted Stord's bid to provide an indirect sludge drying system, and then contracted with several parties to provide various services related to the construction of the sewage drying equipment and facility. (Moran Aff., Exh. 9, at 2.)  Joint Meeting contracted with M&R Mechanical, Inc. ("M&R") to construct the facility housing the indirect sludge drying system. (Berkowitz Cert.,

Exh. B.)  In turn, M&R subcontracted with Dynamic Air, Inc. ("Dynamic") to provide the facility's pneumatic conveying system.  (Barrett Brief, Exh. D; Moran Aff., Exh. 6, at 29 ¶¶14-15).  Joint Meeting also contracted with Hatch Mott MacDonald ("HMM"), formerly known as Killam, to act as a general contractor and oversee the construction of the facility and its integration with the sewage drying equipment.  (Valese Cert., Exh. 1.)

In April 1993, Joint Meeting and Stord entered into Contract 900, whereby Stord was to supply an indirect sludge drying system, including dryers, steam boilers, and compaction and granulation equipment based on Parson's design.  (Moran Aff., Exh. 7, Art. X at 00500-7 & 8.)  Contract 900 provided that "[t]he intent of the Contract Drawings and Specifications is that [Stord] shall furnish all labor, materials, equipment and transportation necessary for the proper execution of the work . . . ."  (Moran Aff., Exh. 7, Art. III at 00500-5.)  Under Contract 900, "[Stord] shall do all the work outlined in the Contract Documents and all incidental work necessary to complete the project in a substantial and acceptable manner, and fully complete the work or improvement, ready for use, occupancy and operation by [Joint Meeting]."  (Moran Aff., Exh. 7, Art. III at 00500-5.)

In April 1994, Joint Meeting and M&R became parties to Contract 910 for the purpose of constructing the facility and installing equipment, including what Stord had built according to Parsons' design specifications.  M&R then subcontracted with Dynamic to provide the facility's pneumatic conveying system, which was also designed by Parsons.  That system was intended to transport the pellets from the processing equipment to the storage silos.  In Contract 910, M&R agreed that the work meant "[t]he entire completed construction of the various separately identifiable parts thereof required to be furnished under the Contract Documents.  Work includes

and is the result of performing or furnishing labor and furnishing and incorporating materials and equipment into the construction, and performing or furnishing services and furnishing documents, all as required by the Contract Documents." (Moran Aff., Exh. 8, Art. I, 00500-5.)

In June 1994, Joint Meeting contracted with HMM (then Killam), to oversee construction of the facility Parsons had designed, and to ensure its proper operation upon completion. HMM agreed to provide "construction management services for the sludge drying facility, including construction management, resident engineering, construction inspection, and home office support." (Moran Aff., Exh. 17, at 4, sec. (b).) As part of its construction management, HMM agreed "to continuously monitor the construction effort of [M&R] to ensure that it is performed in accordance with contract plans and specifications." (Moran Aff., Exh. 17, at 5, sec. (2).) In addition, HMM's contract with Parsons obliged HMM to "review all Contractor submittals . . . to ensure compliance with contract documents (plans and specifications)." (Moran Aff., Exh. 17, at 5, sec. (4).) The contract further states that "[f]ollowing the final inspection, [HMM] will supervise the Contractor's startup of the equipment to ensure proper operation." (Moran Aff., Exh. 17, at 7, sec. (11).)

Construction began in 1994 and was substantially completed in 1996. The parties do not dispute that when Joint Meeting and Stord conducted initial tests, the drying system did not perform adequately, causing the system to shut-down. The dried sludge pellets produced were dusty and difficult to handle and transport, and did not conform to the specifications outlined in Contract 900. (Moran Aff., Exh. 10, at 2-3.) As a consequence, Joint Meeting withheld its final payment to Stord. (Moran Aff., Exh. 10, at 2-3.)

In January 1997, Stord filed a lawsuit in state court seeking to recover the payment Joint

Meeting had withheld, which amounted to $2.5 million, and Joint Meeting counterclaimed for negligence and engineering malpractice in the design and specifications of the sludge drying equipment and facility.  Stord also asserted claims against Parsons, M&R, and a sub-contractor, Cleaver Brooks.  Parsons, in turn, filed cross-claims against Joint Meeting, Cleaver Brooks, and M&R for contribution and indemnification and impleaded HMM as to the same.  (Moran Aff., Exh. 9 at 3.)  HMM, M&R, and Cleaver Brooks filed both cross and counterclaims for contribution and indemnification.  (Moran Aff. Exh. 9 at 3-4.)

Joint Meeting and Stord ultimately settled the state court action and dismissed all claims against Parsons, Killman, M&R, and Cleaver Brooks without prejudice.  (Carlowicz Cert., Exh. 1 & 2.)  The settlement agreement required Stord to meet certain performance requirements.  By 2001, Stord was in substantial compliance with its obligations, and Joint Meeting waived any remaining deficiencies.  (Moran Aff., Exh. 10, at 8-10.  On October 10, 2001,  Joint Meeting began operations at the facility.  (Moran Exh. 2, Response #13; Moran Ex. 29.)  On June 6, 2003, Joint Meeting closed the facility, claiming that the sludge drying equipment and facility were unable to produce a marketable pellet.  (Moran Aff., Exh. 32.)

Before operations ceased, both Joint Meeting and Stord filed complaints against Parsons based on its design of the sludge drying equipment and facility.  Joint Meeting sued in state court, asserting that it paid Parsons $45,958 to conduct a Market Study and $798,552 to design the sludge drying equipment and facility, and spent over $20 million hiring various contractors and engineers.  Joint Meeting seeks damages from Parsons in the full amount.

Parsons removed Joint Meeting's state lawsuit to this Court.  Subsequently, Stord filed a federal complaint against Parsons based on diversity, alleging professional negligence, unjust

enrichment, and indemnification. Stord claims that it spent more than $7 million constructing sludge drying equipment according to Parsons' design. In its answers to the complaints, which were consolidated, Parsons asserted counterclaims against Joint Meeting for indemnification, contribution, and breach of contract; against Stord for indemnification and contribution; and filed a third-party complaint against HMM, M&R, Dynamic, and Cleaver Brooks, asserting the right of indemnification and contribution for the work each performed during the construction of the sludge drying facility.

On March 3, 2004, the Court set forth a discovery schedule requiring fact discovery to be completed by December 31, 2004 and fixed dates in 2005 for affirmative engineering reports, responding expert reports, and deposition of experts. HHM, M&R, and Dynamic were granted leave to file the within dispositive motions prior to the conclusion of fact discovery. In their motion papers, they argue that they were not involved in the design of the sludge drying equipment or facility and that Parson's design is the cause of the plaintiffs injury. In addition, HMM individually argues that it is not liable for the claim against Parsons for breach of warranty.

**Standard of Review**

Summary judgment is appropriate when the court determines that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party." Id.

In Anderson, the Supreme Court held that the substantive law governing a lawsuit will identify which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248. And when reviewing for materiality, all factual inferences must be drawn in favor of the non-moving party. Bailey v. United Airlines, 279 F.3d 194, 198 (3d Cir. 2002).

**DISCUSSION**

Do Issues of Fact Exist that Preclude Summary Judgment

M&R and Dynamic frame their motions in substantial part around an answer Parsons gave to initial Interrogatories. Asked what Parsons was relying upon in alleging that M&R and Dynamic's work was negligent, Parsons responded that it does not "now contend" that Dynamic's and M&R's work was " 'negligent or defective,'" but only alleges that "if Parsons is found liable, then [these defendants'] work should also be deemed to be 'negligent or defective.'" (Parsons gave the same answer to Interrogatories propounded by the settling third-party defendant, Cleaver Brooks.) Based on these responses, M&R and Dynamic claim summary judgment is required because there is no factual basis upon which they can be found culpable. They also argue the neither has a contractual relationship with Parsons. Dynamic further points out that it was a subcontractor hired by M&R and never had a contractual relationship with Joint Meeting.

HHM argues individually that Parsons' claims against it are "derivative" of the underlying complaints brought by Stord and Joint Meeting, which "fall outside the scope of

services which HMM agreed to undertake on the project." (HMM's Brief at 1.) It argues for dismissal as a matter of law in that it is not liable for Joint Meeting's claim against Parsons for breach of warranty because HMM never made any representations as to warrantability.

In opposition, Parsons points out each of the third-party defendants was integrally involved in the Joint Meeting facility. HHM was Joint Meeting's professional engineer and provided oversight, coordination, and review of the construction of the facility. M&R was the construction contractor and installed and supplied certain equipment pursuant to Contract 910. Dynamic was involved in the pneumatic conveying system, as to which the plaintiffs have alleged problems.

The record to date indicates, according to Parsons, that there are ambiguities surrounding the precise basis of Joint Meeting's and Stord's claims of liability. Parsons emphasizes that the extent of the third-parties' involvement raises numerous and disputed issues of fact should Parsons be deemed liable. It notes that the third-party defendants have not shown that there can be no set facts supporting a claim for contribution or indemnification against them. Therefore, Parsons argues these defendants cannot prevail on the basis that no genuine issues of material facts exist about their potential liability. As a consequence, Parsons states there is no basis to preclude it from its legal right to seek contribution or indemnification from the third-party defendants should Parsons be held liable to pay damages to the plaintiffs.

Dynamic also argues that the manufacturer of a component part is "generally," under New Jersey law, not liable for a defective component part unless the manufacturer substantially participated in the design of the final product. . The Court has examined the cases Dynamic relies on and does not find them persuasive because causation is not central and they arise in the

context of strict or special liability, making them distinguishable.

In the two lawsuits that Parsons is defending, Joint Meeting's alleged injury is that the facility does not function continuously for its intended purpose nor does it produce an acceptable product. And Stord alleges claims based on professional negligence, unjust enrichment, equitable subrogation, and common law indeminification. Parsons' third-party claims are contingent upon a finding that it actually is liable to these plaintiffs. The Court agrees with Parsons that, given the contingent nature of its claims and the open issue of whether the facility functions and if not, why it is not functioning, there are issues of fact that preclude summary judgment in favor of the third-party defendants.

The Court denies the third-party defendants' motions for summary judgment on the basis that there are no disputed issues of material fact.

<u>Is Parsons Precluded from Asserting Its Substantive Claims</u>

The third-party defendants have also advanced arguments that Parsons cannot assert substantive claims of indemnification and contribution against them, and that the Court must grant summary judgment in their favor as a matter of law. In this diversity case, the Court applies New Jersey substantive law.

**Indemnification**

The Supreme Court of New Jersey, in adopting the Restatement of Torts addressing indemnification, has held that "[a] person who, without personal fault, has become subject to tort liability for the unauthorized and wrongful conduct of another, is entitled to indemnity from the other for expenditures properly made in the discharge of such liability." <u>Cartel Capital Corp.</u>

v. Fireco of New Jersey, 81 N.J. 548, 566 (N.J. 1980) (quoting Restatement, Restitution §96 at 418 (1937)).  The movants all attack Parsons' indemnification claim on the basis that they did not contract with Parsons.

In New Jersey, a right to indemnification can be express or implied.  Port Authority of NY and N J v. Honeywell Protective Services, Honeywell, Inc., 222 N.J. Super. 11, 20 (App. Div. 1987) (a right of implied indemnity may be created as an equitable remedy "to prevent a result which is regarded as unjust or unsatisfactory").  Where no contract exists, the Supreme Court has held that "[i]t would be inequitable to permit an active wrongdoer in the absence of a contractual understanding between the parties to obtain indemnity from another," and escape any responsibility.  Cartel Capital Corp., 81 N.J. at 566.  Under established state precedent, then, the absence of a contract is not fatal to Parsons' indemnification claim.  The privity defense is clouded factually as well:  M&R's contract with Joint Meeting contains a standard indemnification clause, which arguably extends to subcontractors like Dynamic.

HMM urges that the lack of a contract between it and Parsons is significant, relying on Conforti & Eisele, Inc. v. John C. Morris Assocs., 175 N.J. Super. 341 (Law Div. 1980) and Polidori v. Korys, 217 N.J. Super. 424 (App. Div. 1987).  But in Conforti, Judge Marzulli recognized the disfavor attending the privity defense, and the test that he sets forth – were it utilized by this Court – more properly would apply to Joint Meeting and the third-party defendants, not Parsons and the third-party defendants.  The facts Polidari sufficiently distinguish it from being persuasive authority in this case.

HMM asks two rhetorical questions on page 17 of its Moving Brief, which rest on the premise that Parsons' claims are derivative.  This begs the question, however.  As Parsons

indicates, a claim for indemnification against a third-party does not have to be derivative of a plaintiff's initial claim against the defendant/third-party plaintiff. (Parsons' Brief at 15.) Parsons relies on the New Jersey Supreme Court's discussion in Adler's Quality Bakery, Inc. v. Gaseteria, 32 N.J. 55, 75-76 (N.J. 1960) for the proposition that claims for indemnification are sustainable based on a third-party defendant's liability to the original plaintiff, not to the third-party plaintiff, regardless of the theory of liability asserted against it. The Court agrees.

HHM relies on Sykes v. Propane Power Corp., 224 N.J. Super. 686 (App. Div. 1988), for its argument that its participation in, and the scope of its contractual obligations toward, the facility were limited, and thus Parsons' indemnification claim must fail. But Parsons has alleged significant and integrated involvement of all the third-party defendants in the construction of the facility, and the Court is obliged at this juncture to draw all favorable inferences in Parsons' favor.

Third-party defendants also argue that because Parsons has not asserted claims of negligence against them, then any claim for indemnification must be dismissed. However, Parsons is defending against the plaintiffs on grounds that Joint Meeting operated the facility, and so the design cannot have been defective. The very essence of a claim for indemnification is a lack of fault by the defending party. Cartel Capital, 81 N.J. at 566; Polidori, 217 N.J. Super. at 432. Construing the facts such as they are known this early on in the litigation in favor of the non-movant, Parsons' claim of indemnification does not fail simply because it has not alleged negligence against the third-party defendants.

The Court denies the third-party defendants motions for summary judgment in their favor on Parsons' indemnification claims.

**Contribution**

The Joint Tortfeasor Contribution Act defines "tortfeasors" as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." N.J.S.A. 2A:53A-3.  The statute was enacted "to promote the fair sharing of the burden of judgment by joint tortfeasors and to prevent a plaintiff from arbitrarily selecting his or her victim." Holloway v. State, 125 N.J. 386, 400-01 (N.J. 1991).  Whether or not a plaintiff has asserted a claim against a tortfeasor, each party's fault must be found and "[a]ny party who is compelled to pay more than his percentage share may seek contribution from the other joint tortfeasors." N.J.S.A. 2A:15-5.3(e).  As indicated above, Joint Meeting and Stord are seeking damages from Parsons that exceed the amount they paid Parsons.

The third-party defendants claim that they are not joint tortfeasors with Parsons because Parsons' design of the facility preceded their manufacturing and engineering services, but this. reliance on the chronology of events is misplaced.  Under New Jersey law, to determine whether two parties are joint tortfeasors, courts are to look at whether the tort victim suffered cumulative or disparate injuries.  Cherry Hill Manor Assoc. V. Faugno, 182 N.J. 64, 75 (N.J. 2004).  In that case, the New Jersey Supreme Court recognized that "the Legislature intended that the term 'same injury' in its definition of joint tortfeasor  relate to the harm the tort victim suffered and not the cumulative damages the tort victim sustained as a result of multiple disparate injuries caused by multiple tortfeasors." Id.  Therefore, a prior tortfeasor is entitled to contribution by statute from a potential subsequent tortfeasor if the resulting "injury" was similar to the injury allegedly caused by the initial tortfeasor.  Id.

Here, an issue of fact remains as to why the sludge drying facility cannot produce reusable pellets. HMM, M&R, and Dynamic each provided manufacturing or engineering services in the construction of the facility and the equipment that the plaintiffs are suing Parsons over. Third-party defendants have not offered persuasive authority that would establish that the targeted complaints by Joint Meeting and Stord against only Parsons relieve other potential tortfeasors of liability.

Significantly, "[h]ow joint tortfeasors arrive at the litigation should not affect the substantive right of contribution." Holloway, 125 N.J. at 402. "[I]f plaintiff chooses to sue only one joint tortfeasor and that joint tortfeasor is consequently compelled to bring his own contribution action against other tortfeasors, he should in the contribution action be both entitled to and burdened by the same contribution consequences which would have obtained had plaintiff himself sued both tortfeasors." Holloway, 125 N.J. at 402 (citing Lee's Hawaiian Islanders, Inc. v. Safety First, 195 N.J. Super. 493, 506 (App. Div. 1984)).

The Court denies the third-party defendants' motions for summary judgment in their favor on the contribution claims.

**Underlying Breach of Warranty Claims (HHM)**

HMM argues that on the underlying claims for breach of warranty, Parsons is not entitled to indemnification and contribution from it. HMM avers that it has made no express warranties and under New Jersey law engineers and architects cannot be held liable for an implied warranty. However, Parsons seeks indemnification and contribution for Joint Meeting and Stord's claims against Parsons, so the appropriate question for the Court is whether *plaintiffs* can maintain an action for breach of warranty against Parsons. As indicated, this is a question that

remains open, precluding an award of summary judgment in HHM's favor.

**Conclusion**

For the foregoing reasons, the motions for summary judgment brought by third-party defendants HMM, M&R, and Dynamic are **denied**. An appropriate order will be entered.

Dated:  September 29, 2005                                  /s/ Katharine S. Hayden
                                                             Katharine S. Hayden, U.S.D.J.